JOHN ATKINS v. J. W. MADRY.

(Filed 3 October, 1917.)

1. **Master and Servant—Employer and Employee—Safe Place to Work— Defects—Trials—Evidence—Questions for Jury.**

It is the duty of the master to provide his servant a safe place to work in the performance of his duties; and where there is evidence tending to show that an inexperienced employee was directed by his employer to remove the tin from the roof of a closely sheathed shed, which fell with and injured him by reason of the fact that only the tin attached to the adjoining building held the shed and kept it from falling over, of which fact the employer was unaware and could not reasonably have seen, and the shed fell without his knowing why: *Held,* it is sufficient upon the issue of defendant's actionable negligence.

2. **Master and Servant—Employer and Employee—Safe Place to Work— Assurance of Master—Assumption of Risks.**

Where the place furnished by the master on which the servant is required to work in the course of his employment has a hidden defect therein of which the servant was unaware and which he could not have reasonably ascertained, and which caused an injury, the subject of his action for damages; and the employer instructed the employee to do this particular work, assuring him, upon his inquiry, of the safety of the place and of the work to be done thereon: *Held,* the direction .thus given, with the assurance of the master of its safety, relieved the employee of assuming the risk in doing the work, there being nothing in the appearance of the place which would have caused a man of reasonable prudence to have refused to do the work thereon.

3. **Master and Servant — Employer and Employee — Safe Place to Work— Evidence—Opinion—Trials—Questions for Jury.**

Where damages in an action are sought for the failure of the master to provide a safe place for his employee to work, testimony of witnesses that the place was a safe one is incompetent, that being a question for the court and jury upon conflicting evidence.

ACTION to recover damages for personal injuries, tried before *Allen, J.,* at March Term, 1917, of HALIFAX.

*A. Paul Kitchin and A. W. Dunn for plaintiff.*
*Stuart Smith and W. E. Daniel for defendant.*

WALKER, J. Plaintiff and other hands were employed by the defendant in August, 1916, to remove some tin from the roof of a shelter, or large lumber shed, at Tillery, N. C., and was instructed by his employer to go upon the top of the shelter and do the work. Plaintiff had no experience in such matters, nor did he know anything about the construction of the shelter, nor was there anything on the roof of it to notify him of any weakness in any part of it, or of any danger in performing the task assigned to him by the plaintiff. There was evidence which tended to show that plaintiff did know, or could by the exercise of ordinary care have known, that the shelter was supported by the tin which was nailed to an adjoining house, there being no braces under the shed to stay or support it. When the tin was ripped from the house, there being nothing left to hold up the shed, it collapsed and injured the plaintiff in the manner described. The defendant contends that removing the tin was a simple process, requiring no former experience and no particular skill, nor was the work of such a dangerous nature as to require the master to instruct his inexperienced servant as to how to do it. His counsel, therefore, insist that the case falls naturally and easily within the rule laid down in the following cases: *Rumbly v. R. R. Co.,* 153 N. C., 457; *Martin v. Mfg. Co.,* 128 N. C., 264; *Dunn v. R. R. Co.,* 151 N. C., 313; *Brookshire v. Electric Co.,* 152 N. C., 669; *Simpson v. R. R. Co.,* 154 N. C., 51; *Mercer v. R. R. Co.,* 154 N. C., 399; *House v. R. R. Co.,* 152 N. C., 397; *Bunn v. R. R. Co.,* 169 N. C., 651. They especially rely on two of the above cases—*House v. R. R. Co.* and *Simpson v. R. R. Co.*—and quote the following passages from them: In *House's case* it was said: "As stated in *Hicks v. Mfg. Co.,* 138 N. C., 319-325, and other cases of like import, the principle more usually obtains in case of machinery more or less complicated, and more especially when driven by mechanical power, and does not, as a rule, apply to the use of ordinary every-day tools nor to ordinary every-day conditions, requiring no special care, preparation or provision, where the defects are readily observable and where there was no good reason to suppose that the injury complained of would result. The reason for the distinction will ordinarily be found to rest on the fact that the element of proximate cause is lacking; defined in some of the decisions as 'the doing or omitting to do an act which a person of ordinary prudence could foresee would naturally or probably produce the injury.' *Brewster v. Elizabeth City,* 137 N. C., 392."

The Court said, in *Simpson's case,* after stating the general rule as to complicated machinery: "If there was any negligence it could better be imputed to the plaintiff in taking his position on the car between two

piles of cross-ties, if it was a dangerous one, than to any one else. The hands did the work assigned to them in their own way, and without any special instruction as to the manner of doing it, and there was nothing to indicate that it was of such character as to be inherently dangerous or likely ot result in injury to any one, if carefully done. There was nothing in its nature which called for anything more than ordinary skill or even any experience in a work of like kind. The plaintiff required no insttruction as to the proper method of doing so simple a piece of work. That degree of care which every man of reasonable prudence exercises in the ordinary affairs of life would have been a sufficient safeguard against injury." To the same general effect is *Covington v. Furniture Co.*, 138 N. C., 374, and the other cases cited above. But we think that the principle upon which those decisions rest does not apply here, where the facts are esentially different, as some of the evidence we recite will show. It must be borne in mind that there was a defect in this structure, of which the employee had no knowledge, and which he could not have ascertained except by a careful examination. In the position he stood on the top of the shelter, with solid sheeting underneath, he could not see the defect, which was practically hidden from him. It is true, he says that he asked his employer if there was any danger, but we see that he was assured by him that there was not—at least as far as he knew. Plaintiff testified: "Mr. Madry did not give any instructions as to how to take the tin off. He said get it off the quicket way. He was not on the shelter when it fell. I was hurt—hurt my back. I could not see that the shelter was about to fall. The shelter was sheeted solid—tin over top of it. Could not see through it. After we got the tin off, it was solid sheeted. Boards put close together, nails holding boards to tin. I don't know what caused the shelter to fall, unless it was taking the tin off. I did not knock loose or take out any brace. I do not know why the shelter fell at the time it did. Three colored men up there with me. I was not Mr. Madry's foreman. Did anything that came to hand; hauled brick, wood, filed the boiler, put brick in the kiln. Never had moved any tin from the top of a building before. Tin was thrown off the building as it was taken up. Saw nothing to indicate that the shelter was about to fall when I removed the tin. The shelter was solid. I did not see anything. From where I was, I could not have seen what was holding the planks up. Fell from the shelter to the ground. Did not have time to get off after the shelter began to fall. Had no notice that it might fall." And again: "The shed was open underneath. I did not go there to examine the shelter. Mr. Madry said it was safe. I did not have time to examine the shelter. The shelter was open. Don't know what it was resting on. Made no examination whatever. I went under the front to see a sick mule. After I went under it I did not make any

examination of it. I knew that I was going on top to rip off tin. I did not see any danger. I could have seen underneath if I had gone under there, and could have seen exactly what was holding it together." We have quoted what we consider to be the material parts of plaintiff's testimony, to show that the facts of this case, and those of the cases we have cited, are not governed by the same principle. In none of those cases was the servant told that the structure was safe before he entered upon his work, and they were of such a kind that the servant could detect any danger in the progress of the work, as could his master.

In *Rumbly v. R. R. Co., supra,* which resembles this case in its general features more than any other, there was nothing which amounted virtually to an assurance from the master that the building was safely constructed and in the usual way, or that "the work was safe," and when the workmen had knocked off the rafters the condition of the joist, on which he was standing, and from which he fell, was exposed to his view, or he at least had a fair oportunity to examine and know its condition with reference to safety or danger, and this is what the principle of those cases like *Rumbly v. R. R. Co.* means: that the employee, as he goes on with his work, must beware of revealed dangers, and look out for them, which he can easily do by proper care and caution. If he must stand on a joist to do his work, he can test its strength, if he will, before using it. But in this case the plaintiff was told by his employer that the place where he was working, and the work itself, was safe. He had a doubt about it, and inquired of his employer, so that he could quit if it was dangerous, or have his doubt removed. There is one other view which distinguishes this case from the others. Here the workmen had expressed a doubt as to their safety, and plaintiff then made his inquiry of his employer. Under these circumstances, was it not the plain duty of the defendant to inform himself of the safety or danger of the shed? Was it not clearly the duty of the master to make the inspection when his attention had been especially called to it, and not leave his servants exposed to a possible danger? If he had not examined the building, and did not know whether or not they were in danger, he should not have answered the question as he did, and have thrown them off their guard, and let them go on with the work, relying upon his assurance of safety. Besides, he was overseeing and directing the particular work that was being done, and gave the order which caused them to cut away the supporting tin, when the plaintiff could not see the danger in doing so. He did not leave the work to them with instructions to perform it according to their own judgment and to take care of themselves. The work in the *House* and *Simpson cases* was very simple, and any one could have done it in perfect safety by the exercise of ordinary skill, care and prudence. The character of the work was fully exposed to view. In those cases the

danger of the work was before them, so that the employee could see and understand it; while here, the danger was hidden, and was not, and could not be disclosed in the ordinary progress of the work. The plaintiff suddenly fell to the ground without knowing what had occurred to cause his fall. The authorities, we think, are in harmony with these views, as will appear from the following: An employee's assumption of risk may be abrogated by a distinct order that he use a dangerous appliance, accompanied by an implied assurance that it is safe. *Cherokee Brick Co. v. Hampton,* 84 S. E., 328. An employee, injured in executing a direct order of his employer, will not be held to have assumed the risk of obeying it, unless the danger was so great that a reasonably prudent man would not have obeyed the order. *United States Leather Co. v. Showalter,* 113 Va., 479. Where the employer's foreman assures the employee, upon his making complaint, that he is in a safe place to work, and commands him to proceed with the work, the responsibility for resulting injuries is on the employer, and ordinarily the law reads into an employment contract an agreement by the servant to assume the known risks of the employment so far as he comprehends them; but this implication may be abrogated by an express or implied agreement to the contrary if the servant complains and the master assures him there is no danger. *Massee & Felton Lumber Co. v. Ivey,* 12 Ga. App., 583. A master is liable for injuries to a servant in the execution of an express direction, where the servant was ignorant of the incident danger. *McClary v. Knight,* 73 W. Va., 385. "A servant has the right to rely upon the representations and assurances of the master, or his viceprincipal, as to the absence of, or precaution against, danger, unless the danger is obvious and imminent." 26 Cyc., 1185. "Where a servant knows of defects in machinery, appliances, or place of work, but is, by words, acts, or conduct of his master, lulled into a sense of security, and continues in the service, and is injured by reason of such defects, he may nevertheless recover, unless the danger is well known to him, or is so plain and obvious that a prudent, careful man would refuse to run the risk. A person assumes the risk of injury from dangers and defects which are so patent and obvious that he either knew, or in the exercise of ordinary care should have known of their existence. On the other hand, a servant is under no primary obligation to investigate for latent defects and test the fitness and safety of the place, fixtures, or appliances provided him by the master. He has a right to rely upon the obligation resting upon the master to exercise reasonable care to see that they are fit and safe; and although the circumstances may be such that a servant is chargeable with knowledge of such defects as are patent and obvious, and of such defects as in the exercise of ordinary care he ought to have knowledge of, he is not to be deemed as having notice or as assuming

the risks of such defects and insufficiencies as can be ascertained only by investigation and inspection for the purpose of ascertaining that there is no danger." *Ibid.*, pp. 1213-1216. We have held repeatedly that a servant is not barred of recovery, under the doctrine of assumption of risks, unless he knew and apprecited the danger, or the danger was so obvious and imminent that no reasonable and ordinarily prudent man would continue to work in its presence. The duty of the master, in the exercise of ordinary care, to furnish a reasonably safe place for his servant to do his work, is primary and absolute. If he has a better opportunity to know of defects than his servant, and they are unknown to the latter, their obligation to exercise care, diligence and prudence is not exactly the same, and should not be. With respect to machinery and appliances, it was said, in *Pressly v. Yarn Mills,* 138 N. C., 417: "The principle which holds the employee to an equality of obligation and responsibility in the respect suggested is unsound and unjust, and has been rejected in the more recent and better considered cases." Beach on Cont. Neg., sec. 372; *Lloyd v. Hanes, supra; Patterson v. Pittsburgh,* 76 Pa. St., 389; *Kane v. R. R.,* 128 U. S., 91; *Smith v. Baker,* Appeal Cases (1891), 325. The Court held, in *Yarbouogh v. Geer,* 171 N. C., 335: "The rule that the servant assumes the risks incident to the nature of a dangerous employment has no application to injuries directly resulting from the negligence of the master, in failing in his duty to furnish him a safe place to work, or that of another to whom the master had delegated this duty." This rule was fully considered, in its various phases, at the last term, in *Howard v. Wright,* and the authorities reviewed. In *Howard's case* the plaintiff was working on a platform, when a plank broke and he fell to the ground and was injured. In our case the plaintiff was not remedying the defect in the shed, but merely stripping the tin from it, and he did not know of the particular danger incident to its faulty construction; and, besides, he was assured of its safety and ordered to "get the tin off the quickest way," being told at the same time that there was no danger, or that "it was safe," to use the exact words of Madry. The case, therefore, in its legal aspect, is substantially like those just cited above. The plaintiff was in no fault, as he testified that he did not see the defect or know that the shed was about to fall, and give his reason for not knowing, and he did not find out what was the cause of the fall until after the accident. There was conflicting evidence, but the jury have settled it in favor of the plaintiff. The charge of the learned judge was a very correct one, and gave the defendant at least the benefit of every principle of law to which he was fairly entitled, and, if anything, was more favorable to him than to the plaintiff. He required the latter to show that he was not aware of the defect in the shed, and of the danger, and could not have acquired knowledge

of it by the exercise of ordinary care, in order to recover. This did not give the plaintiff the full benefit of his master's assurance of safety, but the defendant obviously cannot object to this omission, as he received a benefit from it, and there is nothing else in the charge available to the defendant in asking for a reversal.

The objections to evidence are untenable. The question as to what the other men on the shed had said in regard to the danger had been sufficiently answered by the plaintiff, for he said: "I called Mr. Madry to the edge, but he did not come to see whether it was safe or not, and the other men there said they thought it was dangerous." It was then that Madry assured him that the work was safe, and the same may be said about the three colored men being on the building. The other exceptions have no merit. The defendant could have prevented the injury by the exercise of proper care, and it was not for the witness to say whether or not he exercised proper care, as the question was one for the court and the jury to decide upon the facts. If defendant had not given the promise of safety, without inspecting the shed, the plaintiff would not have proceeded with his work. If defendant did not know whether or not the shed was safe for his workmen, or had no knowledge of its condition, then his assurance of safety and his order to his servants were little short of reckless. The testimony of the plaintiff may not be true, and the verdict may be wrong on the facts, but we can afford the defendant no remedy, even if this be so. The judge below only has the power to do so.

No error.